[885 NYS2d 264]

Slattery Skanska Inc. et al., Plaintiffs, and Bombardier Transit Corporation, Respondent, v American Home Assurance Company, Appellant, et al., Defendants.

First Department, September 1, 2009

## APPEARANCES OF COUNSEL

*Shaub, Ahmuty, Citrin & Spratt, LLP*, Lake Success (*Steven J. Ahmuty, Jr., Christopher Simone* and *Gerard S. Rath* of counsel), and *White Fleischner & Fino, LLP*, for appellant.

*McKenna Long & Aldridge LLP*, New York City (*Charles E. Dorkey III, Alan F. Kaufman* and *S. Jane Moffat* of counsel), for respondent.

## OPINION OF THE COURT

CATTERSON, J.

This action arises out of an accident that occurred on September 27, 2002, in which an AirTrain light rail transit test train derailed in a curve on the aerial guideway that runs between the Howard Beach station and the Federal Circle station near JFK International Airport in Jamaica, Queens.[1] At the time of the accident, the test train, with no occupants except the train operator, was participating in an acceleration test. When the test train derailed, large concrete slabs that had been placed in the lead car for added weight followed Newton's first law of motion, shifted, and then crushed the train operator against the operator's console. As a result of the accident, the train operator was killed. Furthermore, there was some $16 million in property damage.

In 1997, plaintiffs Slattery Skanska Inc., Perini Corporation, Koch Skanka, Inc., and Skanka (USA), Inc. (hereinafter referred to as Slattery) and plaintiff Bombardier Transit Corporation

---

1. AirTrain-JFK is owned by the Port Authority of New York and New Jersey. It is designed to be a fully automated, driverless transit system that runs from JFK Airport to Howard Beach for connection to the New York City transit system and to Jamaica, New York, for connection to the Long Island Railroad and the New York City transit system.

(hereinafter referred to as Bombardier) formed a consortium known as the Air Rail Transit Consortium (hereinafter referred to as ARTC). In April 1998, the Port Authority of New York and New Jersey (hereinafter referred to as the Port Authority) entered into a design and build contract (hereinafter referred to as the contract) with ARTC for the construction of the Air-Train.

The contract provided for the design, fabrication, installation, testing and demonstration of the track system, guideway superstructure and rail cars of the AirTrain. Slattery was responsible for the construction of the AirTrain infrastructure, including the train stations, power substations and elevated track or guideway. Bombardier was responsible for manufacturing and supplying the train cars, control systems and communication systems, and testing and commissioning of the Air-Train.

The contract contained a comprehensive insurance scheme that required the Port Authority to secure the following insurance policies covering the ARTC members and their suppliers and subcontractors: (1) first-party builder's risk insurance "covering the improvements or other [w]ork to be effectuated by the [c]ontractor and the [s]ubcontractors," (2) third-party commercial general liability insurance, (3) workers' compensation and employer's liability insurance, and (4) excess liability insurance.

The Port Authority initially obtained builder's risk insurance from Reliance Insurance Company. When Reliance became insolvent, the Port Authority placed the policy with defendant American Home Assurance Company (hereinafter referred to as AHA), with a policy period of August 15, 2000 to December 31, 2003 (hereinafter referred to as the AHA Policy).

Bombardier's AirTrain Test and Commissioning Rule Book (hereinafter referred to as the T&C Rule Book) sets out "operational rules to ensure that the [AirTrain] system is operated safely and efficiently." It describes the relevant testing and commissioning process as follows:

> "The Testing and Commissioning . . . process begins when the first section of the Jamaica JFK with Howard Beach Light Rail System (AirTrain) is handed over to the Test & Commissioning Organization . . . for the start of test and commissioning. It is complete when the entire Light Rail System is ready for revenue operation . . .

"Typically, Test & Commissioning for each test section begins with the first traction power application in the test section and the subsequent start of vehicle/ATC dynamic testing. Once the section is handed over from construction, any access to that section is under the control of the Test & Commissioning Organization."

Section 12.0 of the T&C Rule Book describes the protocol for waiving operating constraints. It states:

"Waiving of Operating Constraints—If the test involves the waiving of any normal operating constraints (as given in this manual), the Test & Commissioning supervisor or delegate must identify the specific operating constraints to be waived and the safety precautions to be taken to ensure the safe conduct of such a test."

An attachment to the T&C Rule Book, entitled "Instruction Number: 6—Waiver of Constraints For Testing" states that the "purpose of this instruction is to ensure the safety of personnel during Test and Commissioning where, due to testing requirements, T&C rules and/or Safety systems are required to be temporarily suspended." It then describes the procedure to follow in the event that a "safety system" is required to be temporarily suspended.

The procedure provides, in pertinent part:

"5.1—Activity covered by the Work Authorization can only take place provided approval of the Site Safety Engineer, T&C Supervisor and Site Engineering Manager.

"5.2—Rules and Safety systems temporarily suspended/disabled must be clearly identified.

"5.3—Alternate Safety measures must be clearly identified and must be in place before the activity can take place.

"5.4—The waiver can only cover the activity identified under the Permit Number. For each activity a new waiver must be approved and no waiver can cover any similar activity."

The "Waiver of Constraints For Testing" form, which was also attached to the T&C Rule Book, specifically lists the supervisory and management personnel authorized to waive safety con-

straints. The only three individuals authorized to waive safety constraints were Safety Engineer Jeremy Jordon, T&C Supervisor Baha Guliter and Engineering Manager Brian Heeney.

It is undisputed that as part of the project's testing and commissioning process, a power distribution system integration test (hereinafter referred to as the acceleration test) was required to ensure the safety of future passengers of the AirTrain. The test was designed to calibrate the trip limits of certain transit power substation circuit breakers. It involved the simultaneous starting and accelerating of two trains at maximum throttle, one at the Howard Beach inbound platform and the other at the Lefferts Boulevard inbound platform. The record reflects that it was necessary that the trains accelerate simultaneously, at maximum throttle, in order to achieve a high enough current draw so that the circuit breakers could be calibrated to a level that would be reflective of starting and/or stopping several trains in actual service. The written parameters for the acceleration test, contained within Bombardier's "Power Distribution System Integration Test Procedures," specified that each of the trains involved in the test would have four cars. It also specified that the two trains would accelerate in the same direction in "Automatic Train Control" (hereinafter referred to as ATC mode).

The record reflects that ATC mode is the mechanism that physically controls and operates the train in the place of a human operator. The ATC mode directs the train's starting and stopping and intervals between other trains. The ATC mode also controls the train's rate of acceleration, known as "jerk limiting," so that "the passengers are not thrown around inside the vehicle."

Shortly before the acceleration test, however, a Bombardier systems engineer working off-site at its Canada headquarters advised, in an e-mail, that the test be performed in manual mode. In other words, he advised that a driver control the train with direction from an operations center instead of using the prescribed driverless ATC mode of operation. The e-mail was sent to the three individuals at Bombardier that possessed authority to waive safety constraints.

It is undisputed that Bombardier conducted the test in manual mode. It is also undisputed that Bombardier disengaged the

speed governor that limited train speed to 15 miles per hour in manual mode during the acceleration test.[2]

Furthermore, the record is clear that Bombardier ran the trains with two instead of four cars, and, to compensate for the loss, loaded tons of concrete blocks onto the first cars. The slabs were placed unsecured on sheets of plywood in the passenger compartments of each of the loaded vehicles.

Since the transit system was not yet in operation and was designed to be a driverless, fully automated system, neither of the two operators assigned for the test had experience operating on the main line. The operators were normally responsible solely for moving and positioning cars and trains within yards where they operated in manual mode and where the speed governor limited train speed to 15 miles per hour. Although operators were trained to retrieve disabled trains from the main line, such retrievals were performed in manual mode with its 15-miles-per-hour maximum speed. The operators did not receive any training in operating trains at speed greater than 15 miles per hour.

It is undisputed that no "Waiver of Constraints" form to conduct the acceleration test in manual mode, with the speed governor disabled or with only two cars loaded with concrete blocks, was ever prepared or approved.

On the morning of September 27, 2002, Bombardier made preparations for the manual acceleration test, which included disabling the speed governors on the two trains. In order to disable the speed governor, a Bombardier employee had to open the driver control panel and disconnect a wire. Then, a technician prepared each train for manual operation, and the two trains were loaded with concrete blocks for weight.

During the second round of testing, train No. 121 accelerated to approximately 58 miles per hour, entered a curved portion of the guideway with a speed limit of 25 miles per hour and derailed, damaging the train and 150 feet of the noise parapet wall. When the train derailed, the concrete slabs that had been placed in the lead car for added weight shifted and pinned the train operator against the operator's console, severely injuring him. He was transported to a local hospital where he died later that day.

---

**2.** Each car contains a speed governor that prevents the train from exceeding 15 miles per hour in manual mode. If a train exceeds 15 miles per hour in manual mode, an alarm sounds and automatic brakes apply.

The accident was the subject of investigations by Bombardier, the Port Authority and the National Transportation Safety Board. Each came to the same conclusion: the accident resulted from the driver missing his assigned stopping point, overspeeding into a curved section of the guideway and derailing.

Plaintiffs submitted notices of loss in September 2002 based on section 10 of the AHA Policy which provides:

> "This policy, subject to the terms, exclusions, limitations and conditions contained herein or endorsed hereon, insures against all risks of direct physical loss of or damage to Insured Property while at the project location, while in offsite storage or while in transit all within the Territorial Limits specified in the policy and during the term of this insurance contract."

"Insured Property" is defined in section 11 (A):

> "This policy insures all material, supplies, machinery, equipment, fixtures, scaffolding, temporary structures, falsework, forms, hoardings, excavations, site preparation and other property of a similar nature owned by the Insured, all of which is to be used in or incidental to the fabrication, erection, or completion of the Project while situated at the Project Location defined in the policy, whether the property of the [i]nsured or property of others for which the insured may be legally liable, subject to the exclusions, limitations, terms and conditions of this Policy and to the extent such values are reported for premium purposes."

In October 2002, AHA reserved its rights. In March 2004, AHA denied coverage based on section 11 (B) (4) of its policy. Specifically, AHA identified the ATC mode, the speed governor and the waiver of constraints paperwork as supervisory or safety systems that were each deliberately circumvented by Bombardier. Section 11 (B), entitled "Extensions of Coverage," provides:

> "Subject to the terms, exclusions, limitations and conditions contained herein or endorsed hereon, this policy also insures: . . .

> "(4) Testing/Commissioning

> "If a specific premium rate has been assigned under this policy for testing/commissioning, then this

policy covers testing/commissioning for the specified period as enumerated in this policy.

"This policy is extended to cover loss resulting from or caused by Insured Property undergoing performance testing, commissioning and/or start up runs.

"For purposes of coverage and premium computation, the performance testing, commissioning and/or start up runs period shall mean and be limited to that period beginning either with the first introduction into the Insured Property of feedstock or other materials for processing or handling or the commencement of supply to a system and continuously thereafter whether or not such testing, commissioning or start up runs is continuous or intermittent and termination on the expiry period of time as provided in the policy.

"The Insured warrants that supervisory or safety systems shall not be deliberately circumvented during such periods, but the Company shall not withhold coverage where it can be reasonably show[n] that the management or supervisory staff was not aware of such situations.

"The foregoing provisions where not otherwise in conflict shall apply to functional tests but not limited to hydrostatic, pneumatic, electrical, mechanical and hydraulic and included in all circumstances without limitations to time period of coverage."

In March 2004, plaintiffs brought this action for damages contending that the accident was covered by the plain language of sections 10 and 11 (A) of the policy. Slattery asserted alternative claims against AON Risk Services Companies, Inc. and AON Hamond & Regine, Inc. (hereinafter referred to as AON), in the event that the AHA Policy was determined to not provide coverage for Slattery's claims. Bombardier did not assert a claim against AON.

AHA moved for summary judgment arguing, inter alia, that, as a matter of law, the plaintiffs had breached the warranty in section 11 (B) (4) of the policy prohibiting them from deliberately circumventing "supervisory or safety systems." Subsequently, plaintiffs each moved for partial summary judgment as to coverage, with an inquest on damages to follow. In support, plaintiffs

argued, inter alia, that a plain reading of sections 10 and 11 (A) mandates coverage.

AON's motion to dismiss asserted that, in the event the court granted Slattery's summary judgment motion on its coverage claim against AHA, Slattery's alternative claims against AON should be dismissed as moot. AON's motion also raised independent grounds for dismissal of Slattery's claims, including that Slattery lacked standing to sue AON as an additional insured under the policy issued by AHA to the Port Authority.

By an order dated December 17, 2007, the court denied AHA's motion for summary judgment dismissing the complaint and granted the motions of Bombardier and Slattery for partial summary judgment on their causes of action for breach of contract. The court denied as moot AON's motion to dismiss Slattery's alternative claims against AON.

The motion court reviewed the language of sections 10 and 11 (A) of the policy, and concluded that they unambiguously covered the instant accident. Because coverage was provided by sections 10 and 11 (A), the court determined that section 11 (B) (4) was irrelevant.

Despite the fact that section 11 (B) is entitled "Extensions of Coverage," the court construed AHA's invocation of section 11 (B) (4) as an argument that section 11 (B) (4) was an "exclusion" of coverage. It then concluded that any ambiguity in the section would make it insufficient to support a rejection of coverage.

The court then found that the term of the "testing period" was ambiguous, because it commenced when the project received "feedstock" or "supply." The court determined that these terms were lifted from a policy concerning a manufacturing facility and had no meaning here. In order to save the section from having no purpose, the court concluded that section 11 (B) (4) conferred coverage on the plaintiffs in the event that during a test an accident damaged third-party property. As such, it read the section as creating third-party liability coverage.

The court further determined that, because the acceleration test could not be conducted using the ATC mode and speed governor, there could be no basis for excluding coverage for failure to employ those devices during the test in question. Finally, the court rejected Bombardier's argument that AHA's failure to comply with Rules of Practice for the Commercial Division (22 NYCRR 202.70 [g]) rule 19-a warranted judgment in insured's

favor, finding that denial of the insurer's motion "on substantive grounds" was sanction enough.

On appeal, AHA contends that the motion court fundamentally misapprehended the nature of first-party property insurance by holding that section 11 (A) covered damage to Bombardier's own property whereas section 11 (B) (4) covered damage to the property of third parties. AHA further asserts that it properly rejected coverage for breach of the warranty regarding supervisory and safety systems contained in section 11 (B) (4). In support of its argument, AHA points to the undisputed facts that Bombardier disengaged a speed governor on the rail cars and failed to adhere to the required procedure for waiving operating constraints by conducting the acceleration test in "manual mode" with an untrained driver.

Bombardier maintains that the purpose of the policy was to protect it against *any* physical damage to the project, prior to its completion. In support of its argument, Bombardier points to the language in section 10 of the policy which expressly insures against "all risks of direct physical loss of or damage to Insured Property." While acknowledging that the protection offered in section 10 applies only to "Insured Property," Bombardier contends that "all material, supplies, machinery, equipment, fixtures" are included in the definition of insured property, and receive the protection set forth in section 10.

Bombardier claims that section 11 (B) (4) has no application to the rest of the policy. Indeed, Bombardier argues that the section appears to have been "cut and pasted" from an inapposite policy and placed here, where it has no applicability at all. Its only possible meaning, according to Bombardier, is to either add coverage for third-party liability in the event of a testing accident, or to extend coverage beyond completion of the work, but only to damage caused by testing.

Alternatively, Bombardier asserts that section 11 (B) (4) is ambiguous and should be interpreted against AHA. Bombardier challenges AHA's interpretation of "deliberate circumvention of supervisory or safety systems" arguing that (1) the terms "deliberate circumvention" and "supervisory or safety systems" are ambiguous (2) the ATC mode of vehicle operation and speed governor are not supervisory or safety systems and (3) completion of the waiver of constraints, a Bombardier form, was not required by the policy and, in any case, Bombardier identified the increased safety risks and implemented alternative safety measures.

■ As a preliminary matter, the motion court did not improvidently exercise its discretion in refusing to decide the competing summary judgment motions in Bombardier's favor solely because of AHA's failure to comply with Rules of Practice for the Commercial Division rule 19-a regarding the statement of uncontroverted material facts. (*See Holtz v Rockefeller & Co., Inc.*, 258 F3d 62, 72-74 [2d Cir 2001].)

■ We find that the AHA Policy is not a liability policy, but a first-party casualty insurance policy. The sole purpose of the AHA Policy was to insure certain property from physical harm. This purpose is plainly spelled out in section 10 of the policy. That section states that the insurance is for "physical loss of or damage to Insured Property," not for any liability or claim asserted by a third party. Accordingly, the motion court's conclusion that section 11 (B) (4) only covered damage to the property of third parties during testing and commissioning was fundamentally flawed.

■ We further conclude that the motion court erroneously determined that sections 10 and 11 (A) govern plaintiffs' claim for property damage arising from the acceleration test. Instead, it is clear that section 11 (B) (4) controls the claim.

It is undisputed that section 10 provides coverage subject to section 11 (A). Section 11 (A) states that "Insured Property" is "material, supplies, machinery, equipment, fixtures, scaffolding, temporary structures, falsework, forms, hoardings, excavations, site preparation and other property of a similar nature." Moreover, the listed property was modified by the phrase "all of which is to be used in or incidental to the fabrication, erection, or completion of the Project." Accordingly, "Insured Property" within the meaning of sections 10 and 11 (A) referred to materials "used in or incidental to" the construction of something, not the completed structure.

Because the property damaged in the accident (the rail cars and guideway) had already been fabricated, and was not "used in or incidental to" such fabrication, it cannot be considered "Insured Property" under sections 10 and 11 (A). Once construction was complete and the segment had been turned over to Bombardier for testing/commissioning, coverage was available only through the "Extensions" of coverage found in section 11 (B) (4). Any other interpretation would render section 11 (B) (4) meaningless, and obscure its intended place and usefulness in the AHA Policy. (*See Jefferson Ins. Co. of N.Y. v Travelers Indem. Co.*, 92 NY2d 363, 370 [1998] [rejecting interpretation of policy that "fails to give the provision meaning"].)

Moreover, contrary to the motion court's determination, we find that the first condition of the applicability of section 11 (B) (4) was satisfied: a premium rate was applied to the AHA Policy for testing and commissioning. The record demonstrates that the premium charged by AHA for the replacement builder's risk policy specifically included a charge earmarked for "testing and commissioning." In any event, Bombardier admitted in its complaint that "the Port Authority paid additional premiums to AHA to extend coverage . . . to the testing and commissioning phase" of the project.

 We further conclude that the motion court erroneously determined that section 11 (B) (4), if applicable at all, was not a warranty. In section 11 (B) (4), Bombardier "warrants" it would not deliberately circumvent any supervisory or safety systems during the testing period. The section manifestly is a warranty because it begins: "[t]he Insured *warrants* that" (emphasis added; *see Star City Sportswear v Yasuda Fire & Mar. Ins. Co. of Am.*, 1 AD3d 58, 61-62 [1st Dept 2003], *affd* 2 NY3d 789 [2004]). This plain language confirms the parties' intent to require as a "condition precedent . . . the existence of a fact which tends to diminish, or the non-existence of a fact which tends to increase, the risk of the occurrence of any loss, damage, or injury within the coverage of the contract." (*See* Insurance Law § 3106 [a].)

The central issue in this case is whether, as a matter of law, Bombardier breached the warranty in section 11 (B) (4) of the AHA Policy by (1) deactivating ATC mode, (2) operating the train in manual mode with the speed governor disengaged and (3) failing to comply with the waiver of constraints procedure.

For the reasons set forth below, we find that there is no question that Bombardier deliberately circumvented "safety systems" within the meaning of the policy. Not only is it undisputed that Bombardier deliberately disconnected a wire in the driver control panel in order to disengage a speed governor, but it is also undisputed that Bombardier disregarded the procedure for waiving specific operating constraints.

It is well settled that contracts of insurance are "to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language employed." (*Breed v Insurance Co. of N. Am.*, 46 NY2d 351, 355 [1978] [internal quotation marks and citation omitted].) The best evidence of what the parties to an agreement intended is the language of the agreement itself (*see Greenfield v Philles Records*, 98 NY2d 562,

569 [2002]), especially where, as here, the parties to the insurance policy were sophisticated commercial entities.

Courts "may not disregard clear provisions which the insurers inserted in [an insurance policy] and the insured accepted." (*Caporino v Travelers Ins. Co.*, 62 NY2d 234, 239 [1984].) Where the provisions of the policy "are clear and unambiguous, they must be given their plain and ordinary meaning, and courts should refrain from rewriting the agreement." (*See United States Fid. & Guar. Co. v Annunziata*, 67 NY2d 229, 232 [1986] [internal quotation marks and citations omitted].) "[C]ourts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing." (*Vermont Teddy Bear Co. v 538 Madison Realty Co.*, 1 NY3d 470, 475 [2004] [internal quotation marks and citation omitted].)

Whether a contractual term is ambiguous must be determined by looking within the four corners of the document and not to extrinsic sources. (*Kass v Kass*, 91 NY2d 554, 566 [1998].) Extrinsic evidence cannot be used to create an ambiguity in an agreement, but only to resolve an ambiguity. (*Kass*, 91 NY2d at 568.) That one party to the agreement may attach a particular, subjective meaning to a term that differs from the term's plain meaning does not render the term ambiguous. (*See Moore v Kopel*, 237 AD2d 124, 125 [1st Dept 1997].)

When the terms and conditions of an insurance policy are clear and unambiguous, the construction of the policy presents a question of law to be determined by the court (*Town of Harrison v National Union Fire Ins. Co. of Pittsburgh, Pa.*, 89 NY2d 308 [1996]), and the court may properly grant summary judgment. (*See Hartford Acc. & Indem. Co. v Wesolowski*, 33 NY2d 169, 172 [1973] [in insurance coverage cases, summary judgment is appropriate where there is no relevant evidence extrinsic to an insurance policy, such as questions of credibility or inferences to be drawn].)

Here, although the term "circumvent" is not specifically defined in the policy, the lack of a definition does not, in and of itself, mean that the word must be ambiguous. Bombardier argues that the term "circumvent" means "to get the better of or prevent from happening by craft or ingenuity." That, of course, is not the only meaning of "circumvent." Indeed, AHA cites another dictionary definition of "circumvent," that is, "to bypass."

Bombardier's definition of "circumvent" is not only nonsensical when viewed within the parameters of this dispute but re-

duces the section to a nullity, giving it no comprehensible meaning at all. In context, there can be no question that the plain meaning of circumvent intended by the policy is to bypass or avoid.

Similarly, the phrase "safety system," also undefined in the policy, is unambiguous. Construing the phrase according to common usage, a "safety system" implies a combination of parts forming a unitary whole that is designed to prevent danger, risk or injury. (Merriam-Webster Collegiate Dictionary 1030, 1197 [10th ed 1995].)

This definition is consistent with the definition of "system" supplied by Bombardier. Bombardier, citing its Safety Certification Program Plan, defines "system" as: "A composite of people (employees, passengers, others), property (facilities and equipment), environment (physical, social, institutional), and procedures (standard operating, emergency operating and training) which are integrated to perform a specific operational function in a specific environment."[3]

The record clearly reflects that Bombardier's "safety system" consisted of various component parts including but not limited to: (1) the waiver of operating constraints *and* (2) a train operating in ATC mode without a driver on board *or* a train operating in manual mode with a properly trained driver on board with the speed governor engaged. In other words, these "parts" combined to form a unitary whole that was designed to prevent danger, risk or injury. Even Bombardier's driving trainer testified that a speed governor was part of the train's "overall safety system."

Bombardier's testing protocols, listed in its Test Procedures manual, mandated that the acceleration test be conducted in ATC mode. By deactivating "ATC mode," placing the train in manual mode, disengaging the speed governor, and placing a driver on board who lacked the requisite training to operate the train at high speed, Bombardier "deliberately circumvented" all

---

**3.** Both sides acknowledge that this definition derives from Military Safety Standard 882C which the contract required insured to use. That standard states:

> "System: A composite, at any level of complexity, of personnel, procedures, materials, tools, equipment, facilities, and software. The elements of this composite entity are used together in the intended operational or support environment to perform a given task or achieve a specific production, support, or mission requirement."

of the components of the "safety system" thereby eviscerating the "safety system" in its entirety.

Indeed, it is undisputed that had the speed governor not been disabled, the train would not have derailed: the driver would not have been able to speed through the 25-miles-per-hour turn at 58 miles per hour as the speed governor would not have allowed the train to exceed 15 miles per hour. Accordingly, there can be no doubt that Bombardier's failure to comply with the warranty materially increased the risk of loss. (*See M. Fabrikant & Sons v Overton & Co. Customs Brokers*, 209 AD2d 206 [1st Dept 1994] [a breach of warranty that materially increases the insurer's risk will support rejection].)

Bombardier asserts that it could not perform the test in manual mode with the speed governor engaged and that it was necessary to perform the test under alternate conditions to ensure the safety of future passengers of the AirTrain.[4] Essentially, Bombardier asserts that if AHA's interpretation of the policy is accepted, the very purpose of procuring the policy would be frustrated. We disagree.

Bombardier disengaged the ATC mode and then physically disabled the speed governor. It then permitted the train to be operated at almost 60 miles per hour around a 25-miles-per-hour curve by a driver who had no training above 15-miles-per-hour operation. Even if, viewing the evidence in the light most favorable to the plaintiffs, we accept that these measures were necessary in order to conduct the acceleration test, Bombardier was nevertheless required to complete the waiver of operating constraints.

Indeed, the waiver of operating constraints is itself a "supervisory or safety system" within the meaning of the policy. It was a composite of personnel and procedures used together to achieve a specific purpose. In other words, the waiver ensured that proper safety precautions were taken before a test begins when the operating constraints have been modified. Moreover, the waiver requires the project supervisors to be aware of, and consulted on, any modifications of the operating constraints.

Bombardier asserts that "[t]he waiver of constraints is a document prepared . . . only in circumstances where there is a departure from normal operating constraints," but that no such departure occurred for this test. That representation is not only preposterous, but it is patently contradicted by the record, which

---

4. AHA asserts that the test could, and was designed to, be conducted in ATC mode.

dictates that the normal operating constraints for the acceleration test was the ATC mode. Moreover, Bombardier cannot seriously contend that "[i]t is not a departure from normal operating constraints to operate in manual mode with the speed governor deactivated" when it had to physically open the hostler panel and disconnect a wire in order to disable the speed governor.

We also reject Bombardier's argument that the waiver of constraints requirement was, in substance, satisfied because the three Bombardier employees authorized to sign the waiver of constraints form took alternative safety measures. The policy does not say that "some" supervisory or safety systems shall not be deliberately circumvented. Nor does the policy state that section 11 (B) (4) is inapplicable if other safety measures are instituted in place of the speed governor.

It is clear that an insurance company issues a policy pursuant to a calculated risk. Here, AHA entered the agreement with the bargained-for expectation that Bombardier would not "deliberately circumvent" any "supervisory or safety systems" during the testing and commissioning process. Bombardier's failure to comply with the waiver of constraints procedure is not a matter of "form over substance" because Bombardier's decision to ignore the waiver clearly elevated the risk that AHA was willing to underwrite.

Accordingly, the order of the Supreme Court, New York County (Charles E. Ramos, J.), entered January 3, 2008, which, to the extent appealed from as limited by the briefs, denied defendant AHA's motion for summary judgment dismissing the complaint, granted plaintiffs' motions for partial summary judgment as to coverage and ordered an inquest as to damages, should be reversed, on the law, with costs, defendant AHA's motion granted, plaintiffs' motions denied, and the direction for an inquest vacated. The Clerk is directed to enter judgment accordingly.

GONZALEZ, P.J., TOM, SWEENY and BUCKLEY, JJ., concur.

Order, Supreme Court, New York County, entered January 3, 2008, reversed, on the law, with costs, defendant American Home Assurance Company's motion granted, plaintiffs' motions denied, and the direction for an inquest vacated. The Clerk is directed to enter judgment accordingly.